IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNIE THOMAS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05CV00418 CEJ/AGF |
| | ) | |
| JAMES PURKETT, | ) | |
| | ) | |
| Respondent. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pro se petition of Missouri state prisoner Johnnie Thomas for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that habeas relief be denied.

On September 27, 2000, Petitioner was found guilty by a jury of first-degree murder, armed criminal action, first-degree burglary, and first-degree assault, for crimes committed with another on April 27, 1999. On October 27, 2000, the trial court sentenced Petitioner to consecutive terms of life imprisonment without the possibility of probation or parole, life imprisonment, 15 years, and 15 years, respectively. On January 22, 2002, the convictions and sentences were affirmed on direct appeal. Petitioner filed a timely motion for post-conviction relief, which was denied following an evidentiary hearing. This denial was affirmed on appeal on March 9, 2004.

1

In his timely habeas petition before this Court, Petitioner claims that his constitutional rights were violated in the following ways:

>1. Trial counsel was ineffective in failing to interview and secure a material witness on Petitioner's behalf;

>2. Trial counsel was ineffective in misinforming Petitioner about the consequences of his decision not to testify, such that Petitioner's waiver of his right to testify was not knowing and voluntary.

Respondent argues that review of Petitioner's second claim is procedurally barred and that habeas relief should be denied for the first claim because the state courts' adjudication of that claim was factually and legally reasonable.

## BACKGROUND

### Trial

On July 21, 1999, following a hearing, Petitioner who was 16 years of age at the time of the crimes, was certified to stand trial as an adult. The trial commenced on September 25, 2000. Darnell Thomas, who was Petitioner's cousin and approximately 13 years old at the time of the crimes, testified that on the morning of the crimes, Petitioner approached him with a plan to break into their uncle and aunt's house because Petitioner needed money. The house was two houses away from the house in which Darnell and Petitioner were living with their grandparents and Darnell's mother and younger brother and sister. The plan was for Darnell to be the lookout while Petitioner broke into the house. The two went to the back door of the house in question after they saw their uncle leave, thinking that no one was home, but when they knocked on the door, their aunt opened it. Darnell testified that he and Petitioner entered the house and that Petitioner hit

their aunt on the side of her face and knocked her to the ground.  Petitioner then grabbed her around the neck and began choking her.  Petitioner and his aunt struggled for ten to fifteen minutes, and eventually both fell to the floor in the bedroom.  Petitioner told Darnell to get him a belt, which Darnell did, and Petitioner then choked his aunt with the belt until a whistling sound came from her body.  The two boys, believing their aunt was dead, dragged the body to the kitchen.  Petitioner put a (plastic) bag over her head, and the two dragged her down the steps to the basement and laid her on the floor.  (Resp. Ex. A at 378-94.)

Darnell further testified that he and Petitioner then began to ransack the house looking for money and other items, throwing some things out the window to pick up as they left.  Petitioner found their uncle's shotgun tied to a bed rail and removed it.  While they were still in the house, their uncle returned and came in the back door.  Petitioner grabbed the shotgun and hid in the bathroom, while Darnell sat on the couch in the living room.  Id. at 396-97.

The uncle testified that after leaving the house in the morning, he returned for lunch, and saw his wife's body on the floor in the basement at the bottom of the stairs.  He went down to her after she did not answer his call.  He pulled a bag off her head and saw a belt around her neck, and ran upstairs to use the phone.  He then saw Darnell sitting on the couch and gesturing to him.  The uncle heard a clicking sound coming from two feet behind him, turned, and saw Petitioner pointing the shotgun at him.  The uncle testified that Petitioner said, "don't move, mother fucker, or I will kill you like I killed her."  Petitioner then pulled the trigger, but it again made the same clicking noise the

3

uncle had heard before. The uncle grabbed the barrel of the shotgun and he and Petitioner began fighting over it. Petitioner yelled at Darnell to kill their uncle; Darnell came at his uncle with a knife, but then ran out of the house, returning a few minutes later with his grandparents and mother. Petitioner and his uncle were still struggling. Darnell's mother got the gun away from them, and Darnell and Petitioner fled from the house. Id. at 249-63. The aunt was pronounced dead at the scene. Darnell testified that his crimes were adjudicated in juvenile court. Id. at 410-11.

Petitioner did not testify, and the defense rested without offering any evidence or witnesses. Prior to closing arguments, the trial court asked Petitioner whether he understood that he had the right to testify if he wished to, whether he and his counsel had discussed the pros and cons of him testifying, and whether Petitioner had decided that it would be best for him not to testify. Petitioner responded in the affirmative to all these questions. The court then asked Petitioner if he had any questions on the matter, and Petitioner stated that he did not. Id. at 451-52.

Following sentencing, the trial court inquired into Petitioner's satisfaction with the performance of his appointed counsel. Petitioner stated that counsel had not investigated the case to Petitioner's satisfaction, and that counsel should have contacted Petitioner's brother, Jason Westbrook, to testify on Petitioner's behalf. Petitioner stated that he gave Westbrook's name and address to counsel, and told counsel that Westbrook would be helpful to Petitioner's case. When asked by the court what Westbrook's testimony would have been, Petitioner stated that he would "rather not say at this time." Id. at 493-94. Petitioner also stated that he had wanted to testify at trial, but did not do so on the advice

of counsel, who told him that in closing argument, counsel would say that Petitioner did not commit the crimes. Petitioner told the court that had he testified at trial, he would have denied that he "did this." Id. at 499.

**Direct Appeal**

On direct appeal, Petitioner argued that (1) he was entitled to a new adult-certification hearing; (2) a prosecutorial question during voir dire prejudiced the jury against Petitioner; (3) the trial court erred in overruling Petitioner's motion to strike a certain juror for cause; and (4) the evidence was insufficient to support the burglary conviction. (Resp. Ex. C.) The Missouri Court of Appeals rejected all four arguments. (Resp.'s Ex. F, Doc. #9.)

**State Post-conviction Proceedings**

In an amended motion for state post-conviction relief, filed with the assistance of new, appointed counsel, Petitioner argued that his trial counsel had been constitutionally ineffective for failing to investigate and secure Westbrook as a witness. Petitioner asserted that he had told counsel that Westbrook would testify that on the morning in question, Westbrook discovered Darnell alone at the victims' house, and that as Petitioner "happened by" the house, Westbrook was coming down the driveway and told Petitioner that Darnell was inside crying and saying, "don't tell," whereupon Petitioner went into the house. Petitioner asserted that when he went into the house, he saw his aunt's body, and that Westbrook's testimony would have provided a viable defense for Petitioner, and would have affected Darnell's credibility, and "reasonably" affected the outcome of the trial. (Resp. Ex. H at 40-46.) Petitioner also asserted that counsel has been ineffective in

5

advising Petitioner not to testify, and then not giving a satisfactory explanation, during the trial, of Petitioner's defense.

At an evidentiary hearing held on February 28, 2003, Westbrook, who was then 19 years old, testified that on the morning of the crimes, he and Petitioner, whom he identified as his older brother, were walking to a friend's house and decided to see if Darnell wanted to join them. They, therefore, walked to their grandparents' house, where the Petitioner and Darnell were living. Petitioner went inside, and Westbrook continued walking on. As he was walking, he approached the victims' house and thought he saw Darnell going into the house through the back door. Westbrook followed the person he saw into the house, and once inside he realized that the person was not Darnell, but someone else whom Westbrook did not recognize. Westbrook testified that he surmised from the condition of the house that Darnell and the other person were burglarizing it. He testified that he and Darnell had burglarized the victims' house in the past, but that he did not think it was right for Darnell to do that with an outsider. Westbrook then saw Darnell, who was acting nervous, and Westbrook asked him if he was "tripping." Darnell, stuttering and teary-eyed, told Westbrook "not to tell nobody." Westbrook did not see his aunt or uncle. Westbrook testified that he then went outside, and saw Petitioner approaching the house. Petitioner told Westbrook that Darnell was not at their grandparents' house, and Westbrook told Petitioner that Darnell and someone else were in the victims' house burglarizing it, and that Darnell was "tripping." Westbrook then left, and observed Petitioner walking toward the back door of the victims' house as he left. Later that night, Westbrook learned from his mother that his aunt had been killed,

6

and that Petitioner had been arrested. (Resp. Ex. G at 3-15.)

Westbrook further testified that he met with Petitioner several times while Petitioner was in jail awaiting trial, and that he told Petitioner that he would testify on Petitioner's behalf. Westbrook testified that he met with defense counsel twice before Petitioner's trial, and asked counsel whether it would be helpful if he (Westbrook) knew "what had happened" and knew that "somebody was there," but that defense counsel "was kind of brushing me off, saying that that would be helpful." <u>Id.</u> at 15-16.

On cross-examination, Westbrook testified that his father told him not to tell the police what he saw, because they might arrest him, too, if they knew he was at the house at the time in question. Westbrook admitted that he never told defense counsel that he was actually a witness "to the case," or that he had information to give counsel. He asserted on cross-examination that he asked defense counsel whether it would be helpful if he (Westbrook) knew that someone had been at the house, and counsel said no. <u>Id.</u> at 36-40.

Petitioner testified at the hearing that he gave defense counsel the names of his brother, Westbrook, and his mother, grandmother, and grandfather as possible defense witnesses, and that he told counsel that Westbrook could be reached at Petitioner's mother's house. He further testified that he told counsel that Westbrook knew that Petitioner "didn't do it," and "probably knew who did." <u>Id.</u> at 46-48. On cross-examination, Petitioner acknowledged that although Westbrook had told him that he saw

7

someone else in the house[1], all that Petitioner told defense counsel was that Westbrook "was there before this scene happened" and would be helpful to his case. Petitioner testified that after speaking with Westbrook outside the victims' house, he went inside the house. He stated that he did not see anyone other than Darnell and his uncle. He acknowledged that at one point he had possession of the shotgun and struggled with his uncle, but he denied that he ever pulled the trigger or racked the gun. Id. at 56-62.

Petitioner also testified that prior to trial, he told defense counsel that he wished to testify on his own behalf, but that counsel advised him not to. Petitioner stated that he did not testify based upon this advice, and based upon his trust in counsel to tell Petitioner's "side of the story" during the trial. Petitioner stated, however, that after hearing his counsel's closing argument, Petitioner did not feel that counsel told his side, and had Petitioner known this was going to be the case, he would have insisted on testifying. He acknowledged that ultimately the decision not to testify was his, but he restated that he made the decision based upon his counsel's advice. Id. at 49-51.

Defense counsel testified that he advised Petitioner not to testify as a matter of trial strategy, due in part to "gaps" in Petitioner's story. He also testified that he did not recall the substance of his conversations with Petitioner about Westbrook. He testified that he recalled meeting with Westbrook, but did not recall Westbrook indicating that he had been at the house on the day of the crimes or that Westbrook had any information about who was responsible (for the murder). Counsel testified that if Westbrook had given him

---

[1] Elsewhere, however, Petitioner seems to say Westbrook did not tell him he saw someone else in the house. See id. at 58.

8

information about another party being responsible, or any substantive information, counsel would have remembered that. Id. at 66-74.

The motion court found that Westbrook could have been located through reasonable investigation, and that he would have testified at trial, if called. The court found, however, that Westbrook "would not have given the testimony alleged," and that, even had [Westbrook] testified as plead, it would not have affected the outcome.

> [His] testimony would not have affected the credibility of Darnell Thomas nor affected the outcome of the trial -- it is entirely to be expected that a teenager who has just murdered his aunt and wounded his uncle would be upset and would not want the authorities informed. It would not have provided [Petitioner] with a viable defense, the failure to present that testimony caused [Petitioner] no prejudice, and the failure to present this testimony was reasonable trial strategy.

(Resp.'s Ex. H at 59.) The court also found that advising Petitioner not to testify was reasonable trial strategy. The court, accordingly, denied Petitioner's motion. Id. at 59-60.

The only point raised by Petitioner on appeal from the denial of post-conviction relief was that the trial court erred in its determination that counsel was not ineffective for failing to investigate and call Westbrook as a witness. Petitioner argued that Westbrook could have testified that he saw Darnell and another unknown individual inside the house before Petitioner arrived, that Darnell pled with him not to tell anyone "what he had done," and that Westbrook then encountered Petitioner after Westbrook left the burglarized house. Petitioner argued that the motion court misconstrued the impeachment value of Westbrook's testimony, which even as pled in the post-conviction motion, indicated that Darnell (whether Westbrook had found him at the house alone or with

9

another person), had burglarized the house and "attacked" his aunt before Petitioner arrived. (Resp.'s Ex. I.)

The state appellate court rejected this point on appeal. The appellate court noted that in Petitioner's amended post-conviction motion, Petitioner had only alleged that Westbrook would testify that he saw Darnell leave the house alone, crying, and saying, "don't tell," whereas on appeal from the denial of post-conviction relief, Petitioner was claiming that counsel was ineffective because Westbrook could have testified that he saw another unidentified individual in the house with Darnell before Petitioner arrived. The appellate court held that by not raising a claim in his motion with respect to a second individual at the house or the timing of Petitioner's arrival, these "allegations or issues" were waived on appeal. The court stated that, accordingly, it could only address that portion of Petitioner's argument that related to Darnell's "presence, demeanor and statement." (Resp.'s Ex. K at 4.)

The state appellate court then stated that Petitioner's argument was that Westbrook's testimony would have impeached Darnell's testimony that he (Darnell) had acted with Petitioner. Noting that to be entitled to relief, Petitioner had the burden to show that the impeachment would have provided Petitioner with a viable defense or changed the outcome of the trial, the court reasoned as follows:

> At the hearing, Mr. Westbrook admitted he did not tell [Petitioner's] counsel that he was a witness to anything. In this situation counsel had no basis to call Mr. Westbrook as a witness to impeach their cousin [Darnell]. This alone supports the trial court's determination that counsel's failure to call Mr. Westbrook as an impeachment witness was a matter of trial strategy. Further, even if Mr. Westbrook had given counsel this information, it would not have provided a viable defense. The fact that Mr.

10

>       Westbrook saw only their cousin at the murder scene at a limited point in
>       time does not logically lead to the conclusion that [Petitioner] did not
>       participate in the crimes.

Id. at 5.

## **DISCUSSION**

**Procedural Default**

Petitioner argues that this Court is procedurally barred from considering the merits of Petitioner's claim regarding his right to testify, because this claim was procedurally defaulted in state court due to Petitioner's failure to present the claim to the state appellate court, and Petitioner has not shown any reason to excuse the default. This Court agrees. Under the doctrine of procedural default,

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750 (1991). To constitute a bar to federal habeas review of a claim, "the procedural rule relied upon by the state court must be firmly established, regularly followed and readily ascertainable when it was applied." Winfield v. Roper, 460 F.3d 1026, 1036 (8th Cir. 2006), cert. denied, 127 S. Ct. 2256 (2007); see also Hall v. Luebbers, 296 F.3d 685, 695 (8th Cir. 2002) ("A state procedural rule must be regularly adhered to for it to be an adequate state ground leading to a procedural bar.").

"Cause" under the cause and prejudice test "must be something external to the petitioner, something that cannot fairly be attributed to him," for example, a showing that

11

the factual or legal basis for a claim was not reasonably available, or that some interference by officials made compliance with the procedural rule impracticable. Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)); see also Greer v. Minnesota, 493 F.3d 952, 957-58 (8th Cir. 2007). To show a miscarriage of justice in this context requires "new reliable evidence" that was not presented at trial and that makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House v. Bell, 126 S. Ct. 2064, 2077 (2006); see also Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir.), cert. denied, 127 S. Ct. 590 (2006).

A Missouri inmate procedurally defaults claims which could have been but were not raised on direct appeal, or on appeal from the denial of post-conviction relief. Interiano v. Dormire, 471 F.3d 854, 856 (8th Cir.), cert. denied, 126 S. Ct. 1596 (2006); Moore-El v. Luebbers, 446 F.3d 890, 897-98 (8th Cir.), cert, denied, 127 S. Ct. 673 (2006). Here, the claim at issue was not pursued on appeal from the denial of post-conviction relief, and was thus procedurally defaulted. Petitioner has not asserted, nor does the Court discern, cause and prejudice, or a miscarriage of justice, to excuse this default. The Court notes that because there is no constitutional right to an attorney in state post-conviction proceedings, ineffective assistance of post-conviction appellate counsel cannot establish cause to excuse a procedural default, even when such counsel was appointed by the state court. Interiano, 471 F.3d at 856-57. The Court will accordingly turn to consideration of the merits of Petitioner's remaining claim, namely, that defense counsel was ineffective in failing to investigate and call Westbrook as a witness.

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or confronts facts that were materially indistinguishable from a relevant Supreme Court precedent, but arrives at the opposite result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413; see also Linehan v. Milczark, 315 F.3d 920, 924-25 (8th Cir. 2003). A case cannot be overturned merely because it incorrectly applies federal law, for the application must also be "unreasonable." Colvin v. Taylor, 324 F.3d 583, 587 (8th Cir. 2003) (holding that under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable").

The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to "an even more deferential review." Kinder v. Bowersox, 272 F.3d

532, 538 (8th Cir. 2001). Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." § 2254(e)(1). "The standard is demanding but not insatiable; . . . deference does not by definition preclude relief." Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (citation omitted).

**Trial Counsel's Failure to Investigate and Call Westbrook as a Witness**

Petitioner claims that his constitutional right to the effective assistance of trial counsel was violated by counsel's failure to investigate and call Westbrook as a witness. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of trial counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To succeed on a claim of ineffective assistance of trial counsel, a habeas petitioner must establish both "that counsel's representation fell below an objective standard of reasonableness," and that but for counsel's deficiency, there is "a reasonable probability" that the result of the trial would have been different. Id. at 688, 694. "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. Judicial review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Cagle v. Norris, 474 F.3d 1090, 1097 (8th Cir. 2007) (citations omitted).

A "reasonable probability" that but for counsel's error, the result of the trial would have been different is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "The reviewing court must not consider the attorney error in

isolation, but instead must assess how the error fits into the big picture of what happened at trial. '[A] verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Marcrum v. Luebbers, ___F.3d___, 2007 WL 4270781, at *13 (8th Cir. Dec. 7, 2007) (citing and quoting Strickland, 466 U.S. at 696).

> Moreover, in the context of a § 2254 action, a petitioner
>
> "must do more than show that he would have satisfied Strickland's test if his claims were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner."

Underdahl v. Carlson, 381 F.3d 740, 742 (8th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)); see also Marcrum, 2007 WL 4270781, at *11.

Relevant factors in the inquiry of whether a trial counsel's failure to investigate and call a certain witness resulted in prejudice are "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." Siers v. Weber, 259 F.3d 969, 974 (8th Cir. 2001) (citation omitted).

Here, the state motion court found that Westbrook would not have testified at trial as Petitioner alleged he would have in the post-conviction motion. This finding is reasonable in light of the testimony at the evidentiary hearing. It is unclear, however, whether the motion court based this finding on the court's belief that Westbrook would, rather, have

15

testified at trial as he did at the evidentiary hearing. In concluding that Westbrook's potential testimony would not have provided Petitioner with a viable defense, and that the failure to present the testimony did not prejudice Petitioner, the motion court did not appear to take into account Westbrook's hearing testimony about seeing a second person at the house, but focused only on Westbrook's account of Darnell being upset and asking Westbrook not to "tell" anyone.

The motion court also held that failing to call Westbrook was a matter of trial strategy. A defense counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690-91. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id.; see also White v. Roper, 416 F.3d 728, 732 (8th Cir. 2005) (holding that defense counsel was ineffective in failing to call a certain witness in a murder case, where counsel's investigation was too superficial to reveal the "powerful support" the witness could have provided for the defense theory that the petitioner was not the assailant). Here, defense counsel testified that he did not recall being told by Petitioner or Westbrook that Westbrook had valuable information.

In affirming the denial of post-conviction relief on this claim, the state appellate court refused to consider the claim with regard to Westbrook's potential testimony that he saw another individual in the victims' house with Darnell, and that Darnell, crying, told Westbrook not to tell anyone, before Petitioner entered the house. According to the appellate court, that claim was waived by Petitioner on appeal because he did not articulate

it in the motion for post-conviction relief. In other words, the state appellate court treated this aspect of the claim as procedurally defaulted. Rather than decide whether this default was pursuant to an "adequate state procedural rule," such as to bar this Court's review of this aspect of Petitioner's claim, this Court will consider the merits of Petitioner's ineffective-assistance claim in question in its entirety, a review which the record before the Court permits. See Nance v. Norris, 392 F.3d 284, 291 (8th Cir. 2004) (holding that a federal habeas court may by-pass a procedural default question and proceed to the merits); see also Winfield, 460 F.3d at 1038-39 (reviewing merits of ineffective-assistance claim where state court's procedural reason for not considering the claim was insufficient to bar federal habeas review).

A fair reading of the state appellate court's decision establishes that the appellate court believed that defense counsel's performance was not deficient in failing to call Westbrook, in light of Westbrook's testimony that he (Westbrook) did not tell defense counsel that he (Westbrook) had witnessed anything. This Court cannot say that this was an unreasonable determination, factually or legally. Even accepting Petitioner's and Westbrook's testimony as to what they told defense counsel, the information can, at best, be characterized as vague and uninformative. As such, the courts' findings that counsel was not ineffective in further investigating or calling Westbrook is not unreasonable. In addition, upon review of the entire record, including the trial transcript and the transcript of the post-conviction evidentiary hearing, this Court concludes that Plaintiff did not establish that he was prejudiced by defense counsel's failure to investigate and call Westbrook. Even taking into account the potential testimony that Westbrook saw another individual at

the house and saw Darnell upset before Petitioner's arrival, the state appellate court's holding that Westbrook's testimony would not logically preclude Petitioner's participation in the murder, is still valid. Furthermore, while Westbrook's testimony in question may have contradicted aspects of Darnell's testimony as to the murder, it did not contradict Petitioner's uncle's testimony, including his testimony that Petitioner directed Darnell to kill his uncle, and said to his uncle, "I'll kill you like I killed her."

The Court also notes that Westbrook's testimony at the evidentiary hearing was internally inconsistent, inconsistent with Petitioner's testimony at the hearing, and, as noted by the state courts, inconsistent with Petitioner's allegations in his post-conviction motion. Assessing how the failure to call Westbrook "fits into the big picture of what happened at trial," this Court's confidence in the outcome of the trial, on all charges, is in no way undermined. See, e.g., Garrett v. Dormire, 237 F.3d 946, 950 (8th Cir. 2001) (affirming denial of habeas relief because "we are not convinced that there is a reasonable probability that [Petitioner] would have been acquitted if defense counsel had presented the testimony of one or more of the potential . . . witnesses").

## **CONCLUSION**

The Court concludes that Petitioner is not entitled to habeas corpus relief. The Court does not believe that reasonable jurists might find the Court's assessment of the procedural or substantive issues in this case debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. § 2253(c)(2). See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000) (setting forth the standard for issuing a Certificate of Appealability); Langley v. Norris, 465 F.3d 861, 862-63 (8th Cir. 2006) (same).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Johnnie Thomas for habeas corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability not be issued in this case.

The parties are advised that they have ten (10) days, to and including January 7, 2008 (see Fed. R. Civ. P. 6), in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.

                                          /s/ Audrey G. Fleissig
                                          AUDREY G. FLEISSIG
                                          UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of December, 2007.